May it please the Court, Sharon O'Grady for Petitioner Agustin Camposeco-Montejo. This case is really about a plain mistake that was made by the immigration judge that requires reversal. And that is that he made a mistake about the rights that were afforded the petitioner under the FM-3 card that was issued to him by the Mexican government. It was plainly a non-immigrant card that did not entitle him to citizenship. But the Court didn't understand that and didn't understand that it did not allow for permanent residence in Mexico. Let's see, this goes to the question of the presumption of resettlement? That's correct. And you're arguing the presumption should not apply. The presumption of settlement should not apply because the petitioner was not given an offer of permanent residency. Pardon me, we reach this issue only if there was past persecution, is that correct? In this case it doesn't matter because the immigration judge did find past persecution. And so that's, we're just sort of taking that as a given. Right. And we're moving right on to application of the presumption of resettlement. That's correct, Your Honor. Okay. The judge found that he was plainly persecuted in Guatemala. His family suffered horrific persecution. Okay, that's fine. I just wanted to get that straight. So the only, so the issue that the case turned on before the immigration judge was whether the petitioner did not qualify. And the witness misdescribed the F3 according to the benefits of an F2, is that right? The witness actually did not misdescribe, did not incorrectly describe the cause. He misinterpreted it. But the judge, the immigration judge did misinterpret it. And it was a point that he found to be a critical, critical statement. Well, let's assume that's true. And I think it's true. Is it is an offer of. I guess the difference is the eligibility for permanent residency. Right. That's the difference between the two forms. The main difference. Right. That is that is the principal difference. And the problem that without entitlement to citizenship, the petitioner is basically confined to the area of the camps because the carts can only be renewed at the site of the refugee camp. He's not confined. He has to come back to renew the cart, but he can leave. But he just has to come back to that site to renew the cart. So he's not really confined there 365 days a year, is he? That's correct, Your Honor. But travel in that part of Mexico is difficult, and the experience of the petitioner on the record and of his brother is that the carts were not necessarily recognized when they left the area, so that, in fact, one could not presume that he could travel unimpeded throughout the country. Counsel, is it your argument that without an offer of permanent residency, there can be no firm resettlement? My argument doesn't go that far, but he also was not given some other kind of resettlement, and it's that basis that the firm resettlement cases where firm resettlement has been found are distinguishable, where the only thing that was missing in cases like Vang, at least reading the cases, is the technical offer of citizenship or the technical offer to remain permanently, where here it was not just technical. And none of those cases involved persons who were actually in, living in and confined to, and he was confined to the area of his camps until a year before he left the country, refugee camps. The firm resettlement cases apply to people who, you know, moved to France and went to school, and one of the cases, the father owned a business. This is not the situation that was facing the petitioner in this case, where he was, they were very restricted to the camps until very shortly before he left the country. So there was not a long period, so while a long period of peaceful residence in a country could amount to an offer of, to a firm resettlement, that long period of peaceful existence just didn't happen in this case. On the record, the facts of which are really not disputed. Are you asking us to remand the matter so that the case can be decided under the correct facts? The court has two alternatives. The court could find that substantial evidence simply does not support any finding, any rational fact finder or immigration judge's decision on asylum, or alternatively, if the court could find that had he known the facts, he could conceivably have yet found firm resettlement, then it should remand for a determination under the correct standard. Under the former alternative, the first alternative, isn't that precluded by Ventura? Pardon? Isn't that first alternative precluded by INS versus Ventura? I don't think that Ventura goes that far. I think it's still the function of this court to determine whether there is substantial evidence on the record. But you're only speaking on the firm resettlement issue, right? That's all I've gotten to yet. In other words, if we were to agree with your proposition, then under the first alternative, we could conclude that substantial evidence does not support the finding of firm resettlement. So then the agency should make the determination of eligibility, continue on the other steps to make the determination on the eligibility for asylum. Well, actually, the case will have to go back to the immigration judge on the issue of the one-year period. So the case... Well, that's still open also. The judge did not reach that because of his conclusion of firm resettlement. And if it went back to the immigration judge, we would submit that he also made an error on the withholding of removal because he did not afford the petitioner the presumption of well-founded fear of future persecution based on his history of past persecution. So when he found that the petitioner did not carry his burden, that was incorrect. The burden should have been the government's, and we believe, although we believe he would have carried any burden he would have on that issue. All right. You've got about three minutes left. Do you want to reserve it? I do want to reserve it. Thank you. May it please the Court, my name is Rena Curtis, and I represent the respondent who is the government in this matter. And as she stated, the petitioner is seeking review of the agency's final determination that he was resettled in Mexico prior to his arrival into the United States and that he did not satisfy either of the two exceptions to permanent resettlement. Now, substantial evidence does support the immigration judge's decision that that petitioner was firmly resettled and that he didn't. Well, first of all, you agree that the I.J. misinterpreted the testimony of the petitioner's expert, don't you? I absolutely do not agree that the immigration judge misinterpreted the evidence, and I can absolutely go through that with you. Can you show me in the record what supports his finding about the ---- was testifying to if you take the words completely out of context. Let me ask a question. That's all right. The decision says this, right? On page 544 of the administrative record, according to the I.J., that the witness, Smith, testified that the government of Mexico allows for eventual citizenship for the holders of an F.M. 3 card. Right. And to him, that was an important factor, right, in the finding of Firmism. Now, what's the evidence that supports that statement? Okay. Okay. Again, that's taking that evidence right out of context. And if you just let me, you know, go ahead and tell you, I can explain it. The facts of the case are this. In 1998, and this is what Mr. Smith attests to, in 1998, the Mexican government began issuing F.M. 2 cards, which allowed this permanent resident status, in Chiapas, which is the state where Petitioner was. Now, what happened was the F.M. 3 cards were readily exchanged in the camp for the F.M. 2 cards. So all you had to do is get the F.M. 2 card, and therefore you had permanent resident status and you were also eventually allowed citizenship. Counsel, what is said in the record that the F.M. 2 card was readily exchangeable for the F.M. 3 card at the time the Petitioner left? Okay. That is in all of the expert's testimony, which is found in the administrative record at 266. Okay, let's go there first. And you cite to me specifically the language there that says the F.M. 2 card was readily exchangeable for the F.M. 3 card at the time Petitioner left the refugee camp. It actually might be even quoted in the administrative judge's decision, so let me find it. I don't want to waste all my time on this, because that's pretty much an undisputed fact. I don't think that's undisputed. It's clearly undisputed. Well, perhaps you can show me the record. Yeah, okay. Let me do that. I mean, the bottom line was that the offer was there, and it's – okay, let's see. Here we go. The point of your opposing counsel is the administrative law judge misinterpreted the evidence, so I'm not sure that quoting the I.J. will help you. I know. But in essence, what he said was true. I think what the – Tell us where in the record, you know, you find support for that assertion you made. Okay. I'll get to that next. Well, get to that first. It readily exchangeable. Okay. Well, you're going to have to give me a second to go ahead and find it, because I know that it's in here and it's on this page. While you're looking for that, I also noticed that at the bottom of page 44 of the I.J.'s decision, the experts' declaration Quote, FM-3 holders who entered – oh, the United States could return and renew their FM-3 cards. FM-3 holders who legally entered the United States and later returned to the camps can renew their FM-3s, but have no right to FM-2s. Right. That's correct. That was the expert's declaration that the I.J. quoted. That's correct. How do you get around that? I think – well, citizenship and permanent residence is not required. What is required was that he was – even in the third part of the statute, it says that he was entitled to some other type of resettlement. You still haven't answered the question. Where does it say it's readily exchangeable? Okay. I can find that if I can say one more statement, which is the immigration judge – what he could have been guilty of is not putting his complete thought Where in the record does it say it's readily exchangeable? We've asked that question about ten times and you still haven't answered it. The FM-2s began to be issued in CHOPIS in 1998. Mm-hmm. By 1999 in others. This immigrant document basically confirms the same rights as the FM-3 with one important additional right, that after five renewals, the applicant could apply for permanent residency status. The FM-2 could be exchanged every year. No, not exchanged. It must be renewed every year. Right. Okay. Well, if the judges would read the rest of Mr. Smith's – Mr. Smith's testimony, it is very apparent that all he would have to do – there were no requirements. He didn't have to pay any money. He didn't have to stand on his head. All he had to do was go and exchange his FM-3 card for his FM-2 card. And additionally, the United Nations, 13 months after this program was initiated, the United Nations estimated that 83 percent of all refugees who had FM-3 cards had already exchanged their FM-3 cards for FM-2 cards. In fact, two years prior to the FM-2 cards being released into CHOPIS, they were released into Guantanamo as well as Compache. Counsel, at page 267 of the administrative record, the expert says, and on the last sentence, FM-3 holders who illegally enter the United States and later return to the camps can renew their FM-3s but have no right to FM-2s. All right. I think the issue is this. Prior to him – But what does that mean in terms of your assertion that – It really – Excuse me. In terms of your assertion that they – those two are readily exchangeable. Okay. Now they are not readily exchangeable. This is viewed from prior to his arrival to the United States. Prior to his arrival in the United States, the card that he held in his hand, the FM-3 card, could have been exchanged for an FM-2 card. He left seven months after the Mexican government had extended the offer of permanent resident status to him through him getting his FM-2 card. All he had to do was wait for it to be processed in his camp and he could come pick it up. Because he has now illegally entered the United States, he can only go back and renew his FM-3 card, which basically extends him all of the rights and privileges that he had before, which is he could work and travel and get married and have children all throughout Mexico. He just wouldn't be able to be – have that additional title of permanent resident or, you know, the five renewals. That's his fault. If he had stayed in his camp, he was there for seven months, he should have waited for his FM-2 card to come to his camp and gotten it. If he had gotten it and stayed there like he was supposed to, he would be technically a permanent resident right now. And it's been five years. If he had followed all the rules, he could have been a citizen of Mexico right now. He failed to do that. Let me ask you this hypothetical question. If we were to disagree with you on the readily exchangeable and this argument you've been pursuing, your position that the petitioner was still – or rather the permanent resettlement finding is still supported by substantial evidence? Absolutely. In fact, this is a – Give us something of that argument. Okay. Absolutely. Basically, there is a presumption here, a presumption of firm resettlement. Sixteen peaceful years living in Mexico with all of your basic needs met, your food, your water, your electricity, your shelter, your medical needs – The person in prison would get that. Don't you think he was basically living in a refugee camp? Is that what it amounts to? Right. But, you know, the evidence of the records – Are you saying that people in any country that, you know, are in a refugee camp are permanently resettled? No, I wouldn't say that. However, the facts of this record do indicate that because petitioner, well before he even got his FM-3 card, which is the, you know, permission that allows him to travel that is so important to them – I mean, it's evident that he was traveling all over Mexico. I mean, he was a representative in the refugee camps and he was traveling there. He actually got caught a couple times before when he was a minor, traveling without his documentation and got sent back to Tapas. He also met a different woman in a different village and got married and traveled enough to see her that he had a child with her. And he established – I mean, I think we're getting away from the issue here, which is there's the presumption that he was firmly resettled. You can see Cheo and you can also see Vang. In Cheo, three years in Malaysia equals firmly resettled. In Vang, just like petitioner, 16 years out of the country with a family. His parents are firmly resettled there. It's the, you know, the exact same type of situation. There's the presumption of firm resettlement. Once there's the presumption of firm resettlement, the burden shifts to the petitioner to prove that he comes within the two exceptions. Here are the two exceptions. Exception number one is that he didn't have significant ties to Mexico and that he only stayed there long enough to make travel arrangements to the United States. Sixteen years is plenty long to make travel arrangements to the United States. And additionally, substantial ties, he has a wife and a child in Mexico. Those are substantial ties. And as far as being consciously and substantially restricted, which is the second prong of the exception by Mexico, the fact that he had, you know, all of his needs. He had the right to go to school. He had the right to work. He could travel throughout Mexico. He could even own property anywhere in Mexico except right along the border, which was, you know, Mexico's legitimate right to protect the integrity of the Guatemalan slash Mexican border. All right. We understand your position. Now you're like a minute and a half over your time. Thank you. All right. You've reserved, Mr. Grady, time for rebuttal. First, with respect to whether Augustine had an offer to get an FF2 card while he remained in Mexico, the record simply does not support that. And I want to emphasize that the regulation 308, the 208.15, excuse me, I'm getting farsighted, says that the alien is firmly resettled if prior to arrival in the United States he or she entered into another country with or while in that country received an offer of permanent resettlement. Now, the testimony of Michael Smith was that starting in, and this is at page 173 of the certified record, starting in 1998 or 99 in the state of Chiapas, then they did begin an FM2 program. Now, many of the camps received their first FM2 in 1999. He left and entered the United States in mid-1998, and there is not a scintilla of evidence on the record that he ever knew that they were going to ultimately extend an FM2 card to him. The suggestion by the government to the contrary is not supported by the record. And on page 266, which is Mr. Smith's declaration, he says that he was told by the UNHCR engineer in his visit to Chiapas to explore what was going on with the camps, that previous to 1999 the government of Chiapas did not want to do anything, quote, that smelled of permanence, end quote, for the refugees, and later in that paragraph, that the government of Chiapas delayed implementing immigrant programs for the refugees in Chiapas until very recently because they did not want to do anything permanent for the refugees. So the record is that there was no offer of permanent resettlement made to the petitioner while he was in Mexico. What happened after he left Mexico is not that he could have been prescient and figured out that maybe something would happen later. That's not the test. That's not what the regulation says. And similarly, the government's characterization of the conditions under which he lived in Mexico is not borne out by the record. The government had a chance to cross-examine the petitioner at his hearing. There is no evidence in the record that he was traveling around the country. They didn't ask him what the circumstances were under which he met his spouse. There is no evidence that he lived in a house that had electricity. And I would simply invite the court to look at the record because I believe that the government has not been straightforward in its representation of it. Thank you. All right, thank you. We thank both counsel. This case is submitted for decision. Next case for argument is Lopez one versus Ashcroft. All right, we're ready to proceed.
judges: Thompson, Tashima, Rawlinson